**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 13, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CEDAR SPRINGS HOSPITAL,
INC.,

     Petitioner,

v.

OCCUPATIONAL HEALTH AND
SAFETY REVIEW COMMISSION;
UNITED STATES DEPARTMENT
OF LABOR,

     Respondents.

No. 24-9519

_____

**PETITION FOR REVIW FROM AN ORDER OF THE
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
_____

Dion Y. Kohler, Jackson Lewis P.C., Atlanta, Georgia, for Petitioner.

Leigh Anne Schriever, Attorney (Seema Nanda, Solicitor of Labor,
Edmund C. Baird, Associate Solicitor of Labor for Occupational Safety and
Health, and Louise McGauley Betts, Counsel for Appellate Litigation, with
her on the briefs), U.S. Department of Labor, Office of the Solicitor,
Washington, D.C., for Respondents.

_____

Before **TYMKOVICH**, **BACHARACH**, **PHILLIPS**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This case involves the duty of an employer to keep its workplace safe from recognized hazards. The duty arose when employees encountered seriously disturbed individuals who sometimes acted violently. The intermittent violence required safety measures, and the Secretary of Labor decided that the employer had failed to implement safety measures that would have been effective and feasible.

The issues here are

- whether the Secretary had the authority to penalize the employer for failing to adopt safety measures and

- whether the Secretary acted appropriately in exercising this judgment.

On these issues, we conclude that the Secretary had authority to penalize the employer and exercised this authority in a permissible manner.

**1.     Violence at a psychiatric facility spurs an investigation.**

The case grew out of violence at a psychiatric hospital owned by Cedar Springs Hospital, Inc. A tipster informed the Occupational Safety and Health Administration (commonly called *OSHA*), and it investigated.

In investigating, OSHA applied a statutory obligation known as the *general duty clause*, which requires employers to furnish employees with a place of employment free from recognized hazards that cause, or are likely to cause, serious physical harm or death. 29 U.S.C. § 654(a)(1). OSHA's investigation led the Secretary of Labor to cite Cedar Springs for failing to

implement measures that would have helped protect employees. The

Secretary of Labor gave seven examples:

1.    Reconfigure the nurses' stations to prevent patients from getting office supplies to use as weapons

2.    Provide radios and silent communication devices

3.    Implement Cedar Springs' existing program for safety (called the *Workplace Violence Prevention Program*)

4.    Maintain enough staff to protect employees, particularly when new patients are admitted, when there's a behavioral health emergency, when a staff member is alone with a patient, when staff is on break, and when staff accompany patients away from the hospital

5.    Develop a policy to secure the belongings of patients when they're admitted

6.    Hire or designate staff members with specialized training in security

7.    Investigate and debrief after each incident of workplace violence

R. vol. 10, at 7–10.[1]

---

[1]    The parties disagree on whether the government needed to prove that Cedar Springs should have adopted all seven of the measures or just a single one of them. We need not resolve this disagreement because (1) Cedar Springs does not question the need to adopt two of the measures (implementing Cedar Springs' existing program for safety and developing a program to secure patients' belongings) and (2) we elsewhere reject all of Cedar Springs' challenges involving the other five measures (reconfiguring the nurses' stations, providing devices, supplying enough staff to protect employees, adding staff trained in security, and investigating and debriefing after incidents of violence).

Cedar Springs contested the violation, and an administrative law judge conducted an evidentiary hearing. Based on the hearing, the judge upheld the citation and fined Cedar Springs $13,494 for violating the general duty clause.[2] The Occupational Safety and Health Review Commission declined review, so the administrative law judge's report became the final decision of the Review Commission. 29 U.S.C. § 661(j). Cedar Springs challenges this decision by petitioning for judicial review.[3]

**2.      The Secretary of Labor had the power to issue the penalty.**

The threshold issue is whether the Secretary had the power to issue the penalty. The Secretary generally had statutory power to enforce standards affecting the safety of employees. 29 U.S.C. § 653(b)(1). But that power existed only if another federal agency wasn't already exercising statutory authority over employee safety. *Id.*; *see Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235, 241–42 (2002).

Cedar Springs argues that another federal agency, the Centers for Medicare and Medicaid Services, was exercising this authority. This argument was unexhausted and is invalid on the merits.

---

[2]      The judge also fined Cedar Springs for failing to maintain and timely produce records. But this fine is not at issue.

[3]      UHS of Delaware, Inc. adopts Cedar Springs' arguments. Br. for the Petitioner UHS of Delaware, Inc. at 57, *UHS of Delaware, Inc. v. Cedar Springs Hosp., Inc.*, Case No. 24-9521 (10th Cir. Oct. 30, 2024).

4

Cedar Springs didn't present this argument to the administrative law judge. Instead, Cedar Springs stipulated that the Review Commission had "jurisdiction in this proceeding." R. vol. 16, at 72. So Cedar Springs failed to exhaust the issue by declining to raise it with the administrative law judge. *See Robert K. Bell Enters., Inc. v. Donovan*, 710 F.2d 673, 675 (10th Cir. 1983) (requiring exhaustion of the administrative process before challenging OSHA's final orders); *see also* Gregory N. Dale & P. Matthew Shudtz, *Occupational Safety & Health Law* § 12.11(A), at 4 (Bloomberg BNA 5th ed. 2024) ("If the party loses in a proceeding before an administrative law judge [ALJ] of the [Occupational Safety and Health] Review Commission, it cannot appeal to the courts without exhausting its administrative remedies by first seeking review of the ALJ's decision from the Review Commission.").[4]

Cedar Springs doesn't deny that it failed to exhaust the issue. Instead, Cedar Springs argues that it couldn't waive the argument because it involves an agency's jurisdiction. This argument reflects confusion over the term *jurisdiction*.

---

[4] Cedar Springs did raise the issue in the petition for review, but the Review Commission generally declines to address arguments that were not presented to the administrative law judge. *See* 29 C.F.R. § 2200.92(c) (stating that "[t]he [Review] Commission will ordinarily not review issues that the [administrative law judge] did not have the opportunity to pass upon"). The Review Commission followed this practice here and declined to decide the issue.

We often loosely use the term *jurisdiction* when referring to requirements imposed on an agency or federal court. *See Lopez-Munoz v. Barr*, 941 F.3d 1013, 1015 (10th Cir. 2019) (stating that "the term 'jurisdiction' is often loosely used for requirements unrelated to an agency or court's power to act"). But this loose language isn't always accurate.

Federal courts' jurisdiction is derived from both the Constitution and federal statutes. *See* U.S. Const. art. III, § 2; *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701–02 (1982). This jurisdiction is confined to cases or controversies. U.S. Const. art. III, § 2. So a federal court must ensure the existence of a case or controversy even when all parties want the court to act. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

Agencies are different, deriving power solely from Congress. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). So when an agency strays beyond its statutory authority, a court can ordinarily correct the error. *See State ex rel. Balderas v. United States Nuclear Regul. Comm'n*, 59 F.4th 1112, 1123 (10th Cir. 2023). But what if a party goes to federal court to challenge administrative action without arguing to the agency itself that it lacked authority?

In the 1980s, circuits differed on their approaches. Two circuits characterized an agency's power to act as jurisdictional and held that a party couldn't waive a challenge to an agency's authority to act. *Columbia*

6

*Gas of Pa., Inc. v. Marshall*, 636 F.2d 913, 918 (3d Cir. 1980); *U.S. Air, Inc. v. Occupational Safety & Health Rev. Comm'n*, 689 F.2d 1191, 1193 (4th Cir. 1982).[5] This approach has become obsolete by the Supreme Court's clarification of the term *jurisdiction* and distinctions between review of judicial and administrative action.

First, the Supreme Court has explained that courts have been improperly using the term *jurisdiction* whenever an issue involves a court's authority to act. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–61 (2010). The Supreme Court clarified that the term more properly refers to a narrow class of cases involving a court's power to hear a case. *Id.* For example, when a limit is statutory, the Supreme Court regards the limit as *jurisdictional* only when Congress has clearly characterized the rule as jurisdictional. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013).

> The term *jurisdiction* is thus inapt when applied to agencies:
>
> Both [agencies'] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. Because the question—whether framed as an incorrect application of agency authority or an assertion of authority not conferred—is always whether the agency has gone beyond what Congress has permitted it to do,

---

[5] We took a different approach, recognizing that a court had discretion whether to consider a challenge to an agency's authority to act when the issue had arisen on appeal for the first time. *See Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 552 (10th Cir. 1986).

there is no principled basis for carving out some arbitrary subset
of such claims as "jurisdictional."

*City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013); *see PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1362 (Fed. Cir. 2018) (concluding that a federal court need not act sua sponte when reviewing a challenge to administrative action because *City of Arlington* rejected the distinction between an agency's jurisdictional error and other errors). So courts more recently have declined to address an agency's authority when a party has failed to exhaust the issue. *See United States v. Cortez*, 930 F.3d 350, 357 (4th Cir. 2019) ("Several courts, however, have applied *City of Arlington* to agency adjudications—precisely the context we face here—and concluded that purported 'jurisdictional' claims are subject to the same statutory limits, including exhaustion requirements and forfeiture rules, as other claims that an agency has acted improperly."); *Jalbert v. SEC*, 945 F.3d 587, 593 (1st Cir. 2019) (concluding that "challenges to ultra vires agency action are waivable"); *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1362 (Fed. Cir. 2018) ("Even if the [agency] could be said to have acted 'ultra vires' . . . the [agency's] error is waivable . . . ."); *1621 Route 22 W. Operating Co., LLC v. Nat'l Lab. Relations Bd.*, 825 F.3d 128, 140–41 (3d Cir. 2016) (rejecting an argument that a party could challenge an agency's authority to act at any time based on its jurisdictional nature).

8

Cedar Springs disregards the more recent opinions, choosing instead to follow earlier case law that characterized the scope of an agency's authority as jurisdictional. Because this approach is outdated, we lack any meaningful basis to relieve Cedar Springs of its procedural requirements, such as exhaustion. *See Marshall v. Burlington N., Inc.*, 595 F.2d 511, 513 (9th Cir. 1979) (concluding that an employer failed to exhaust its challenge to OSHA's "jurisdiction").

But let's consider the merits of Cedar Springs' argument if we were to disregard exhaustion. For the merits, we would consider whether the Centers for Medicare and Medicaid Services regulated the disputed "working conditions." *Chao v. Mallard Bay Drilling, Inc.,* 534 U.S. 235, 241 (2002). It wouldn't be enough for the Centers to have this authority; they needed to actually exercise it. *Id.* at 237, 242.

The Centers' statutory role is to administer Medicare and Medicaid services. *See* 42 U.S.C. § 1395hh; Centers for Medicare and Medicaid Services; Statement of Organization, Functions, and Delegation of Authority; Reorganization Order, 66 Fed. Reg. 35437-03 (July 5, 2001). But Congress limited this role to the protection of patients rather than employees. For example, federal law authorizes the Secretary of Health

9

and Human Services[6] to require staff to treat patients. 42 U.S.C. § 1395x(f)(4).[7]

Granted, overlap naturally exists between the roles occupied by the Centers and the Secretary of Labor. In psychiatric hospitals participating in Medicare or Medicaid programs, violent patients could endanger not only employees but also fellow patients. So Cedar Springs argues that the Centers' regulations protect employees as well as patients. For this argument, Cedar Springs points to regulations, a memorandum, and a private organization's guidelines.

Cedar Springs relies in part on 42 U.S.C. § 482.15, which requires every hospital to adopt measures addressing emergency hazards. But these measures are designed to "enhance patient safety during emergencies," not to protect workers. Medicare & Medicaid Programs; Emergency Preparedness Requirements for Medicare & Medicaid Participating Providers & Suppliers, 81 Fed. Reg. 63,860–61 (Sept. 16, 2016).

---

[6]     The Centers for Medicare and Medicaid Services are part of the Department of Health and Human Services. *Est. of Landers v. Leavitt*, 545 F.3d 98, 103 (2d Cir. 2008).

[7]     The Secretary of Health and Human Services argues elsewhere that the Centers can enact regulations to protect patients, but not workers. Letter from Intervenor U.S. Dept. of Health & Hum. Servs. at 1, *Sec. v. UHS of Delaware, Inc.*, OSHRC Dkt. No. 23-0902 (Dec. 20, 2023).

Cedar Springs also relies on a memorandum discussing this regulation, selectively quoting a passage that the Centers' "'all hazards approach' required of healthcare facilities (42 C.F.R. § 482.15) must include policies and procedures aimed at protecting *both their workforce and their patients*." Br. of Petitioner Cedar Springs Hospital, Inc. at 38–39 (emphasis added by Cedar Springs, citing CMS Workplace Violence-Hospitals at 2, https://www.cms.gov/files/document/qso-23-04-hospitals.pdf (last visited Jan. 15, 2026)); *see also* Reply Br. of Petitioner Cedar Springs Hospital, Inc. at 16 (same quotation). But Cedar Springs omits the first part of the sentence, which refers to the regulatory requirements for hospitals to prepare for emergencies. CMS, Workplace Violence Hospitals at 2, https://www.cms.gov/files/document/qso-23-04-hospitals.pdf (last visited Jan. 15, 2026). The memorandum thus refers to training for emergency preparedness, not workplace violence. *See* John I. Winn, et al., *Medical Volunteers During Pandemics, Disasters, and Other Emergencies: Management Best Practices*, 11 Seattle J. of Technology, Environmental & Innovation Law 282, 284–85 (2021) (discussing 42 C.F.R. § 482.15 as a way to address disasters such as 9/11, Katrina, and Covid-19). In any event, Cedar Springs elsewhere observes that we don't defer to agencies' interpretations of federal law and that observation would apply equally here. Br. of Petitioner Cedar Springs Hospital, Inc. at 9 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).

11

Cedar Springs also points to 42 C.F.R. § 482.13. But this regulation serves to protect patients rather than workers, as reflected in the title: *Condition of participation: Patient's Rights. Id.*[8]

Finally, Cedar Springs invokes 42 C.F.R. § 482.62, stating that it "requires each facility to have 'adequate numbers' of staff to address patient aggression, who are trained 'regarding the identification of patients at risk of harm to self or others . . . and mitigation strategies.'" Reply Br. of Petitioner Cedar Springs Hospital, Inc. at 16–17 (quoting CMS, State Operations Manual App'x A–Survey Protocol. Regulations & Interpretive Guidelines for Hospitals at 3); *see also* Br. of Petitioner Cedar Springs Hospital at 40–41 (similar quotation by Cedar Springs about the requirements of § 482.62). But this regulation doesn't mention patient aggression or the need for enough staff with training on how to identify dangerous patients. *See* 42 C.F.R. § 482.62. To the contrary, this regulation

---

[8]    Cedar Springs also points to a memorandum that purportedly describes § 482.13 as a regulation addressing the risk that inpatients pose to themselves "or others." Br. of Petitioner Cedar Springs Hospital, Inc. at 39 (quoting CMS, Memorandum at 2, https://www.cms.gov/medicareprovider-enrollment-and-certificationsurveycertificationgeninfopolicy-and-memos-states-and/workplace-violence-hospitals). But Cedar Springs' characterization of the memorandum is misleading. The memorandum says that "[h]ospitals should also provide the appropriate level of education and training to staff regarding the identification of patients at risk of harm to self or others, the identification of patients at risk of harm to self or others, the identification of environmental patient safety risk factors, and mitigation strategies." CMS, Memorandum at 2. The memorandum doesn't attribute this suggestion to § 482.13 or tie this suggestion to the safety of employees.

12

requires "adequate numbers" of staff "to evaluate patients, formulate written, individualized comprehensive treatment plans, provide active treatment measures, and engage in discharge planning." *Id.*

These protections address only a hospital's procedures to protect patients, doing nothing to displace the Secretary of Labor's broad statutory power over the regulation of workplace violence. *See Usery v. Lacy*, 628 F.2d 1226, 1229 (9th Cir. 1980) (stating that the Occupational Safety and Health Act was designed "to reach as broadly as constitutionally permissible in regulating employee safety"); *see also Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235, 241 (2002) (stating that an agency isn't preempted by another agency's "minimal exercise" over overlapping conditions). Because the Centers' regulations don't govern employee safety, they don't bar the Secretary's enforcement of the general duty clause. *See Chao*, 534 U.S. at 244 (concluding that the Coast Guard's "general marine safety regulations d[id] not address the occupational safety and health concerns faced by [the] inland drilling operations [at issue]" and did not preempt OSHA's enforcement authority); *Austin Indus. Specialty Servs., L.P. v. Occupational Safety & Health Rev. Comm'n*, 765 F.3d 434, 439–40 (5th Cir. 2014) (concluding that another agency's regulation did not prevent OSHA from enforcing an action because the regulation addressed the discharge of a hazardous substance rather than employee safety).

13

Cedar Springs also points to a memorandum containing broad statements about the right of healthcare workers to a safe workplace. *See* CMS Memorandum, at 1, 3, available at https://www.cms.gov/files/document/qso-23-04-hospitals.pdf (Nov. 28, 2022) (last visited Jan. 15, 2026). But these statements don't suggest that the Centers are exercising regulatory power to protect employees.

Finally, Cedar Springs points to accreditation standards by the Joint Commission. But this commission is a private entity, not an agency exercising regulatory authority. So the commission's standards couldn't have displaced the regulatory power of the Secretary of Labor. *See* 29 U.S.C. § 653(b)(1) (stating that the chapter does not "apply to working conditions of employees with respect to which other Federal agencies, and State agencies . . . exercise statutory authority").

In our view, the regulations, the Centers' memoranda, and the accreditation standards don't show that another agency is exercising regulatory authority over employee safety in psychiatric hospitals. So the Secretary of Labor had the power to act, just as the Centers had the power to regulate patient safety in hospitals licensed for Medicare and Medicaid services.

**3.    The Secretary of Labor didn't err in issuing the penalty.**

Cedar Springs argues that even if administrative authority existed, the Secretary would have erred legally by

- failing to defer to other regulatory bodies,

- using adjudication rather than rulemaking to enforce standards for workplace safety, and

- relying on guidance documents.

Because these issues are legal, we conduct de novo review. *3484, Inc. v. Nat'l Lab. Relations Bd.*, 137 F.4th 1093, 1103–04 (10th Cir. 2025). Through this review, we conclude that the Secretary didn't err in rejecting Cedar Springs' arguments.

First, Cedar Springs points out that it complied with other requirements for regulatory bodies and argues that the Secretary should have deferred to those bodies. This argument disregards the Secretary's independent duty to enforce the general duty clause.

Under that clause, "every employer owes a duty of reasonable care to protect [its] employees from recognized hazards that are likely to cause death or serious bodily injury." *Teal v. E.I. DuPont de Nemours & Co.*, 728 F.2d 799, 804 (6th Cir. 1984). The clause is designed "to deter the occurrence of occupational deaths and serious injuries by placing on employers a mandatory obligation independent of the specific health and safety standards to be promulgated by the Secretary." *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980). Given this purpose, the general duty clause is violated when an employer fails to use reasonable care in protecting employees from a known hazard irrespective of compliance with

15

other requirements. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Gen. Dynamics Land Sys. Div.*, 815 F.2d 1570, 1576 (D.C. Cir. 1987) (concluding that OSHA can't "absolve employers who observe specific standards from duties otherwise imposed on them by the general duty clause"); *Duriron Co. v. Sec'y of Lab.*, 750 F.2d 28, 29–30 (6th Cir. 1984) (concluding that the government could show a violation of the general duty clause through expert testimony involving the industry's knowledge of a hazard irrespective of another entity's standard).

Second, Cedar Springs argues that the Secretary should have used rulemaking rather than adjudication. Both processes were available, and we generally defer to administrative bodies when they decide between rulemaking and adjudication. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

In gauging whether an agency official has used informed discretion, we focus on the nature of the underlying obligation, which depends on the particular facts. *Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1207 n.8 (10th Cir. 2009). Given the fact-intensive nature of this inquiry,

16

adjudication provided a sensible approach.[9] *See Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017–18 (D.C. Cir. 2016) (stating that adjudications are "highly fact-specific" (quoting *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013))); *Puffer's Hardware, Inc. v. Donovan*, 742 F.2d 12, 17 (1st Cir. 1984) (concluding that "the Secretary [of Labor] did not abuse his discretion in proceeding under the general duty clause rather than through rulemaking").[10]

Finally, Cedar Springs criticizes the Review Commission for relying on guidance documents. The Review Commission did use the guidance documents, but only to support the broader conclusion that Cedar Springs

---

[9]    Even if the Secretary should have engaged in rulemaking, the error would not have relieved Cedar Springs of liability. That liability stems from Cedar Springs' violation of its statutory duty to safeguard employees from recognized hazards. 29 U.S.C. § 654(a)(1). This violation would remain even if the Secretary should have clarified the required steps through rulemaking.

[10]    Cedar Springs asserts that OSHA admitted the need to engage in rulemaking. Br. of Cedar Springs Hospital, Inc. at 29. For this assertion, Cedar Springs points to a report by an OSHA panel (the Small Business Advocacy Review Panel). The report concluded that enforcement of the general duty clause had not substantially reduced workplace violence in the healthcare and social-service industries. Report of the Small Business Advocacy Review Panel on OSHA's Potential Standard for Prevention of Workplace Violence in Healthcare and Social Assistance, available at https://www.osha.gov/sites/default/files/OSHA-WPV-SBAR-Panel-Report.pdf, p. 5 (May 1, 2023), *cited by* Appellant's Opening Br. at 29 & n.16. Despite this conclusion, OSHA could reasonably proceed through adjudication rather than rulemaking. *See Puffer's Hardware, Inc. v. Donovan*, 742 F.2d 12, 17 (1st Cir. 1984).

17

had violated the general duty clause. For that conclusion, the Review Commission pointed not only to the guidance but also to other evidence such as the reports of expert witnesses. Given the scope of this approach, the Review Commission didn't err by citing the guidance documents.

**4.   The Secretary of Labor didn't deprive Cedar Springs of notice.**

Due process requires fair notice to regulated entities. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).[11] To determine whether a regulated party had fair notice for purposes of due process, we ask "whether the law or regulation 'provides a discernable standard when legally construed.'" *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 773 (D.C. Cir. 2022) (quoting *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017)). So the Secretary needed to notify Cedar Springs how it could have avoided penalties.

Cedar Springs alleges that the Secretary failed to provide this notice by using loose language in the citation, relying on guidance documents, and inconsistently characterizing the required safeguards to protect employees in similar facilities. Because the adequacy of notice involves a legal issue, we conduct de novo review. *See Facet Enters., Inc. v. Nat'l Lab. Rev. Bd.*, 907 F.2d 963, 970 (10th Cir. 1990) (concluding that the

---

[11]   Federal law also requires particularized statements within the citations. 29 U.S.C. § 658(a). But Cedar Springs invokes the right to due process rather than the statutory requirement of particularity.

adequacy of notice in an administrative proceeding presented a legal issue subject to de novo review). Through this review, we conclude that the notice was adequate.

The citation used three general terms:

1.    Adequate staffing

2.    Specialized security

3.    Near misses

Given the generality of these terms, Cedar Springs insists that it couldn't have known what to do.

But a citation isn't necessarily vague just because it uses general language when describing abatement measures. *See BHC Nw. Psychiatric Hosp. v. Sec'y of Lab.*, 951 F.3d 558, 566 (D.C. Cir. 2020) (rejecting a due process challenge based on OSHA's use of general language in a citation for failure to protect staff in a psychiatric hospital). After all, the citation included not only these general terms but also detailed explanations for the terms *adequate staffing* and *specialized security*.

For example, the citation explained that the term *adequate staffing* refers to

> staffing that is adequate to safely address changes in patient acuity and patient census. Staffing levels must allow for safety of staff during admission of new patients, behavioral health emergencies, one-on-one patient assignments, staff breaks, and the accompaniment of patients off-unit. Staffing levels must also allow for and

19

ensure safety during educational instruction on and off the unit, therapeutic activity groups, and recreational periods.

R. vol. 12, at 3. The citation also defined the term *specialized security* as

specific staff with specialized training in security and/or . . . trained security specialists to monitor patients for potential aggression on all shifts and to assist in preventing and responding to Code Green events occurring in the units. Staff must have the skill necessary to re-frame issues, seeking how to keep the patient and persons in the surrounding area safe, while responding to aggressive behaviors. The staff designated to monitor and respond to patient aggression should not be given other assignments, such as patient rounds, which would prevent the designated person from immediately responding to an alarm or other notification . . . .

*Id.*

The citation also used the term *near misses* when explaining that Cedar Springs should investigate each act of workplace violence. *Id.* This term may have been imprecise. But an administrative compliance officer made the meaning clear, explaining to Cedar Springs' employees that the term

- referred to "incidents that didn't necessarily rise to the extent of requiring an injury or a seclusion or restraint event" and

- included "verbal threats," "throwing things," and "successful verbal de-escalation."

*Id.* vol. 2, at 10. And Cedar Springs' own policy used the term, defining *near misses* as "an event that was life threatening or could have had a serious outcome." *Id.* vol. 10, Secretary of Labor's Exh. C-83, at 25.

Through these explanations and the policy itself, Cedar Springs had fair notice despite the generality of the terms in the citations. So the use of these terms did not violate due process. *See ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 618 (6th Cir. 2017) (rejecting an argument that an administrative complaint had failed to provide adequate notice despite use of a general term (*reasonably short period of time*) because greater detail wasn't necessary to flag the problem).[12]

Finally, Cedar Springs faults the Secretary for relying on abatements required at similar facilities. For example, OSHA investigated other psychiatric hospitals and found a need for more crisis intervention specialists and trained security guards. But the Secretary didn't base the penalty against Cedar Springs on measures required at other psychiatric hospitals. Rather, the Secretary based the penalty against Cedar Springs on the level of workplace violence at its own facility and the failure to adequately mitigate the violence.

We see no reason why different abatements at other facilities would have deprived Cedar Springs of notice. After all, the Secretary could

---

[12]     The government argues in part that OSHA's guidelines told Cedar Springs what the citation meant when referring to *staff with specialty training in security*. Cedar Springs disagrees, stating that this guideline provision applies only to hospitals accessible to the public. We need not address this disagreement because the notice sufficed regardless of the guidelines' reference to security staff.

21

choose different abatements to meet the needs at particular hospitals. As a result, the Secretary's use of different terminology suggests individualized decisions rather than a denial of notice.

**5.    The Review Commission didn't err in finding that the abatement measures would have been effective.**

Cedar Springs also argues that even if the notice had sufficed, the Review Commission erred legally and factually when finding that the proposed abatement measures would have materially enhanced workplace safety.

The threshold issue is whether the Review Commission applied the right standard. The Commission considered the additional abatement measures that Cedar Springs could have adopted to reduce the hazards. Cedar Springs challenges this approach, arguing that the proposed abatement measures would have been unnecessary if other measures were already working. For this argument, we conduct de novo review. *See Am. Airlines, Inc. v. Sec'y of Lab.*, 578 F.2d 38, 41 (2d Cir. 1978) (stating that "it is within the scope of [the court's] oversight responsibilities to ascertain whether the Commission applied the correct legal standard").

Cedar Springs bases this argument on *Brennan v. Occupational Safety & Health Review Comm'n*, 494 F.2d 460 (8th Cir. 1974). There the Eighth Circuit observed that even if no one could have foreseen a dangerous chemical reaction, the employer "may still have been in

22

violation of the general duty clause because of its self-admitted failure to take any precautionary steps whatsoever to protect its employees from the hazard." *Id.* at 463. That observation does not automatically exonerate an employer who has taken some precautionary steps to reduce a risk that cannot be eliminated.

To the contrary, an employer may violate the general duty clause if feasible means existed "to eliminate or *materially reduce* the hazard and . . . the proposed abatement is both economically feasible and 'technologically capable of being done.'" *UHS of Delaware, Inc. v. Sec'y of Lab.*, 140 F.4th 1329, 1338 (11th Cir. 2025) (quoting *Beverly Enters., Inc. v. Herman*, 19 O.S.H. Cas. (BNA) 1161, 2000 WL 1693741, at *34 (2000) (Nos. 91-3144, 92-238, 92-819, 92-1257, 93-724)); *see F&H Coatings LLC v. Acosta*, 900 F.3d 1214, 1228 (10th Cir. 2018) (explaining that the Secretary of Labor must prove the "availability of feasible measures that would have significantly reduced the likelihood of the accident" (quoting *Marshall v. Cities Serv. Oil Co.*, 577 F.2d 126, 133 (10th Cir. 1978) (Holloway, J., dissenting))). So an employer could incur penalties for failing to take effective measurers even if they wouldn't eliminate the violence. *See BHC Nw. Psychiatric Hosp., LLC v. Sec'y of Lab.*, 951 F.3d 558, 565 (D.C. Cir. 2020) (concluding that "the Secretary [of Labor] satisfied the General Duty Clause's test by establishing that a comprehensive workplace safety program would more effectively and

consistently apply measures designed to reduce patient-on-staff violence than [a psychiatric hospital's] present system did").

Cedar Springs also argues that the Review Commission lacked evidentiary support when finding that Cedar Springs could have enhanced safety by hiring more security guards, reconfiguring the nurses' stations, and providing staff with silent communication devices.[13] For these factual challenges, we consider whether the Review Commission had substantial evidence for its findings. 29 U.S.C. § 660(a). Evidence is *substantial* if it could provide reasonable support for the Review Commission's findings. *Slingluff v. Occupational Safety & Health Rev. Comm'n*, 425 F.3d 861, 866 (10th Cir. 2005).

The Review Commission had substantial evidence to regard the addition of security staff as an effective way to improve safety. For example, the Secretary of Labor presented a report by a psychiatric expert

---

[13] Cedar Springs doesn't question the effectiveness of four abatement measures:

1.  Implement Cedar Springs' existing program for safety

2.  Maintain enough staff to protect employees

3.  Develop a policy to secure the belongings of patients when they're admitted

4.  Investigate and debrief after each incident of workplace violence

(Howard Forman, M.D.), who had worked in hospital settings with violent patients. Dr. Forman testified that trained security staff could prevent staff injuries. R. vol. 4, at 145; *id.* vol. 10, Secretary of Labor's Exh. C-92, at 17. For this testimony, Dr. Forman referred to his own psychiatric facility, stating that it had enhanced safety by using staff trained in security. *Id.*

Similar testimony came from another expert witness (Jane Lipscomb, Ph.D.), who was a registered nurse with a doctorate in epidemiology. Dr. Lipscomb explained that

- hiring security staff for behavioral health facilities is considered "a 'best practice' in workplace violence prevention" and

- the practice is timely and effective because staff members specializing in security can help restore control after violent episodes.

*Id.* vol. 10, Secretary of Labor's Exh. C-94, at 38, 40. Dr. Lipscomb gave examples of other psychiatric hospitals, where the use of security staff had effectively protected employees from workplace violence. *Id.* at 38–39.

Cedar Springs states that Dr. Forman and Dr. Lipscomb weren't qualified to give expert opinions on effectiveness. These statements consisted of one textual sentence and two footnotes. Br. of Petitioner Cedar Springs Hospital, Inc. at 18–19 n.10; *id.* at 21 n.11; *see* p. 29 n.14, below (stating that similar briefing may have been inadequate to develop an argument). In these passages, Cedar Springs criticizes

25

- Dr. Forman for referring to the practices at one hospital without knowing about its finances and

- Dr. Lipscomb for disregarding the infrequency of particular safeguards at other facilities.

Br. of Petitioner Cedar Springs Hospital, Inc. at 18–19 n.10; *id.* at 21 n.11.

Dr. Forman didn't rely on his experiences at particular hospitals. Instead, Dr. Forman discussed some of the measures taken at Cedar Springs after an administrative inspection and explained how those measures had shown the effectiveness of safety improvements. R. vol. 10, Secretary of Labor's Exh. C–92, at 23 (discussing the enclosure of the nurses' stations). Nor did Dr. Lipscomb ignore the frequency of particular safeguards. To the contrary, she discussed

- safety standards in the industry and

- Cedar Springs' measures after the inspection.

*Id.* vol. 10, Secretary of Labor's Exh. C-94, at 23, 26, 32. Based on these industrial standards and Cedar Springs' actions after the inspection, Dr. Lipscomb opined that particular safeguards had proven effective. *Id.* at 24 (changing the nurses' stations), 25–26 (supplying radios for staff), 30–31 (increasing staff), 40 (adding security staff). So we can't readily dismiss the opinions of Dr. Forman and Dr. Lipscomb based on criticism of their qualifications.

Cedar Springs also argues that Dr. Forman and Dr. Lipscomb proposed only to shift the hazard from some employees to others. Br. of

26

Petitioner Cedar Springs Hospital, Inc. at 23. This argument reflects a misunderstanding of the abatement measure: It states that Cedar Springs could have "[d]esignated specific staff with specialized training in security and/or hire trained security specialists to monitor patients for potential aggression on all shifts and to assist in preventing and responding to . . . events occurring in the units." *Id.* vol. 12, at 3. The measure suggests shifting responsibility for security (1) from untrained staff bearing responsibility for patient care (2) to staff trained in security freed of other responsibilities. The Review Commission thus acted reasonably in concluding that dedication of staff to security would effectively reduce the hazard. *Id.* vol. 18, at 496.

Evidence of effectiveness came not only from experience at other hospitals but also from Cedar Springs' actions following the citation. For example, the citation led Cedar Springs to add staff members responsible for protecting employees. *Id.* vol. 3, at 191–92; *id.* vol. 6, at 155–56. Those staff members included "milieu specialists"—employees responsible for supporting and mentoring other staff and helping to address violent threats. The chief executive officer and director of nursing concluded that the additional milieu specialists had enhanced safety. *Id.* vol. 3 at 191–92; *id.* vol. 6, at 129.

Cedar Springs questions the effectiveness not only of adding security guards, but also of reconfiguring nurses' stations. The nurses' stations

27

contained items like pens, pencils, and paperclips. Cedar Springs staff testified that patients had repeatedly entered the nurses' stations and used these items to attack staff. *Id.* vol. 2, at 89–91; *id.* vol. 3, at 320–21.

Given these incidents, the Review Commission could reasonably infer a reduction of the risk through enclosure of the nurses' stations. For example, the Joint Commission Environment of Care has recommended enclosure of nurses' stations. *Id.* vol. 10, Secretary of Labor's Exh. C-94, at 23. In addition, four individuals testified about the effectiveness of enclosing nursing stations. First, a former nursing supervisor testified that enclosing stations at another hospital had improved the protection of employees. *Id.* vol. 2, at 89–91, 99–100. Second, a mental-health specialist stated that enclosing nursing stations would enhance the protection from violent patients. *Id.* vol. 3, at 320–21. Third, the director of nursing testified that Cedar Springs had responded to the citation by enclosing nursing stations. *Id.* at 214–17. For one station, the hospital added a barrier and a lockable door. *Id.* at 214–15. For three other stations, the hospital extended existing barriers. *Id.* at 216. The director of nursing reported that these measures had improved employee safety by preventing patients from climbing into the stations. *Id.* at 214–17. Finally, Dr. Lipscomb tied greater

safety to these enclosures of the nursing stations. *Id.* vol. 10, Secretary of Labor's Exh. C-94, at 23.[14]

Similarly, Cedar Springs challenges the effectiveness of more radios and silent communication devices. This challenge stems from the Secretary's position that Cedar Springs could have provided staff members with

- "reliable communication devices to rapidly communicate need for assistance, including, but not limited to, times when staff members leave the unit to escort patients" and

- "a means to silently communicate need for assistance without alerting the patient population."

*Id.* vol. 12, at 1–2. The Secretary contended that these devices could have enhanced safety, and substantial evidence existed to support these contentions.

That evidence included opinions by Dr. Forman and Dr. Lipscomb about improvements in safety from the use of communication devices. For

---

[14] Dr. Forman gave a similar opinion. R. vol. 10, Secretary of Labor's Exh. C-92, at 23. Cedar Springs states in a single textual sentence and a footnote that Dr. Forman failed to "provide an adequate basis for his opinion." Br. of Petitioner Cedar Springs Hospital, Inc. at 23–24 & n.13. Cedar Springs may have failed to adequately develop this argument. *See Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008) (holding that an argument raised in a single sentence is inadequately developed); *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."). But the evidence of effectiveness would be substantial even if we were to disregard Dr. Forman's opinion about reconfiguring the nurses' stations.

example, Dr. Forman discussed the use of these devices at a psychiatric facility in New York, stating that "[e]fficient communication carried out through devices that [were] working and available to staff . . . ma[de] everyone realize that care for the patient [would] be delivered professionally and in a safe context." *Id.* vol. 10, Secretary of Labor's Exh. C-92, at 12. Dr. Lipscomb similarly observed that the Joint Commission had concluded that providing communication devices to staff was the most important "engineering control" to enhance the safety of workers. *Id.* vol. 10, Secretary of Labor's Exh. C-94, at 26.

Dr. Lipscomb also pointed out that Cedar Springs had responded to the citation by ordering 100 more radios and providing them to each mental health specialist. *Id.* at 25. And Cedar Springs concedes that the additional radios "materially reduced the hazard." Appellant's Opening Br. at 25.

Despite this concession, Cedar Springs argues that the Secretary didn't support the abatement involving silent panic alarms. Cedar Springs points to testimony from Dr. Forman that his hospital used radios, not silent alarms. And Cedar Springs contends that silent alarms weren't necessary, pointing to a mental health worker's testimony that he could get help by using coded language over a phone or a radio. *Id.* at 26; *see id.* vol. 9, at 129.

We reject this challenge because the Secretary presented evidence that silent alarms could have reduced the risks. For example, Dr. Lipscomb

30

explained that silent alarms "are used widely throughout healthcare, including behavioral health and should be considered to enhance the ability of staff to summon[] support during behavioral emergencies while not alerting patients to the need for additional staff. Such alarms would also enable them to more quickly summon[] assistance and free up their hands at the time of a behavioral emergency." *Id.* vol. 10, Secretary of Labor's Exh. C-94, at 26. In addition, two nurses explained the advantage of silent alarms, stating that they could be activated more quickly than radios or phones. *Id.* vol. 2, at 88–89; *id.* vol. 5, at 75–76.

As a result, the Review Commission could reasonably find effective methods to enhance security through the addition of security guards, reconfiguration of the nurses' stations, and purchase of more communication devices.

### 6.    The Review Commission didn't err in regarding the proposed abatement measures as feasible.

Cedar Springs also argues that the Review Commission erred legally and factually in finding the feasibility of measures of adding staff, increasing security personnel, reconfiguring nurses' stations, and providing silent communication devices to staff. We reject these arguments.

#### A.    The Review Commission properly placed the burden on the Secretary of Labor.

The legal challenge rests on the Review Commission's assignment of the burden on feasibility. For this challenge, the parties agree that the

Secretary of Labor bore the burden on feasibility. *See F&H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1228 (10th Cir. 2018); *see also BHC Nw. Psychiatric Hosp. v. Sec'y of Lab.*, 951 F.3d 558, 563 (D.C. Cir. 2020) ("Proving 'a violation of the General Duty Clause' requires the Secretary to establish that . . . a feasible means to eliminate or materially reduce the hazard existed." (quoting *SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1207 (D.C. Cir. 2014))). According to Cedar Springs, however, it was mistakenly saddled with the burden. Because the issue is legal, we conduct de novo review. *See Amer. Energy, LLC v. Director, Off. of Workers' Comp. Progs., United States Dep't of Lab.*, 106 F.4th 319, 334 (4th Cir. 2024) (concluding that a legal error had taken place when an agency misallocated the burden of proof).

Conducting de novo review, we conclude that the Review Commission properly assigned the burden to the Secretary of Labor. In fact, the Review Commission twice acknowledged that the burden fell on the Secretary of Labor:

1. "After showing the proposed abatement would effectively mitigate the hazard, the Secretary must then show that his proposal is feasible, *i.e.*, capable of being done."

2. "While there are cases with expert testimony on an employer's finances and the abatement's cost, the Secretary can meet the feasibility prong without the proposal's exact cost."

R. vol. 18, at 618, 622.

32

Cedar Springs disregards these statements, pointing to four of the administrative law judge's statements:

1. "There is no evidence that Respondents cannot adopt any of the abatement measures the Secretary identified."

2. "Respondents do not counter the Secretary's evidence that the proposed abatement measures could be put into place without threatening their economic viability."

3. "[T]here is no evidence implementing the proposed abatement would put Respondents out of business or even cause them to become unprofitable."

4. "The affirmative defense of greater hazard was not raised in the Answer and is not at issue here."

*Id.* at 621, 623–24, 626.[15]

These statements do not reflect confusion over the burden on feasibility. After stating twice that the Secretary of Labor bore the burden on feasibility, the administrative law judge discussed the evidence and pointed out that Cedar Springs hadn't countered with evidence of an

---

[15]    Cedar Springs also appears to refer to a fifth passage, stating without explanation that "in the context of the general duty clause, economic feasibility is part of the Acting Secretary's burden of proof and not an affirmative defense as asserted by the Commission." Br. of Petitioner Cedar Springs Hospital, Inc. at 20. To support this argument, Cedar Springs cites page 108 of the administrative law judge's report. There the judge referred to "an affirmative defense of economic infeasibility," stating that Cedar Springs had not raised this defense. R. vol. 18, at 626. The government concedes that this affirmative defense doesn't apply here. *See* Oral Arg. 24:29–27:22. Given this concession, Cedar Springs doesn't explain the prejudice from the administrative law judge's reference to an inapplicable affirmative defense that no one had raised.

33

inability to adopt the measures, a threat to economic viability, or an inability to show a profit based on the costs. These statements don't reflect misallocation of the burden. *See, e.g.*, *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 517–18 (8th Cir. 2004) (stating that a comment that a debtor "had failed to demonstrate how costs would be lower or recovery for creditors higher under Chapter 11 than Chapter 7" did not show that the court had improperly shifted the burden); *Watz v. Zapata Off-Shore Co.*, 500 F.2d 628, 632–33 (5th Cir. 1974) (stating that comments on a lack of evidence offered by a party did not show that the court had improperly shifted the burden of proof). So we conclude that the administrative law judge didn't shift the burden to Cedar Springs.

**B.     The finding on feasibility was supported by substantial evidence.**

Cedar Springs argues in the alternative that the Review Commission lacked evidentiary support for the feasibility of the abatement measures involving the addition of staff, the use of more employees assigned to security, the reconfiguration of nurses' stations, and the availability of silent alarms. For this argument, we consider whether the Review Commission had substantial evidence for the finding on feasibility. 29 U.S.C. § 660(a).

A measure is "'feasible' for purposes of OSHA . . . [when it is] economically and technologically capable of being done." *Baroid Div. of*

34

*NL Indus., Inc. v. Occupational Safety & Health Rev. Comm'n*, 660 F.2d 439, 447 (10th Cir. 1981). Given this definition, the Secretary of Labor can show the feasibility of a given safeguard by presenting evidence of its use after an inspection or in similar facilities. *See Puffer's Hardware, Inc. v. Donavan*, 742 F.2d 12, 19 (1st Cir. 1984) (Stewart, J.) (basing feasibility in part on use of a given measure in similar facilities); *Mod. Drop Forge Co. v. Sec'y of Lab.*, 683 F.2d 1105, 1114 (7th Cir. 1982) (stating that *feasibility* is indicated by other companies' compliance with a regulation); *SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1215 (D.C. Cir. 2014) (stating that limited use of an abatement measure can support the feasibility of expanded use).

The Review Commission could reasonably rely on these forms of evidence when assessing the feasibility of adding staff members. For example, Cedar Springs' former chief financial officer testified that the psychiatric hospital could afford to hire more than 52 full-time employees. R. vol. 6, at 244. According to the officer, the 52 new positions would be the equivalent of about 10 employees working around the clock every day. The officer acknowledged that the additional positions would reduce the profit margin from 30.3 percent to 19.1 percent. *Id.* But the evidence of continued profitability could suggest the feasibility of adding positions.

In addition, Dr. Lipscomb addressed the addition of staff, discussing changes at Cedar Spring after the citation such as the hiring of a floating

35

mental-health specialist who could rotate among units, the addition of a full-time employee in the human resources department who could focus on recruitment and retention, and the employment of a program manager. Dr. Lipscomb opined that these changes had shown that Cedar Springs could have adopted similar measures before the inspection. *Id.* vol. 10, Secretary of Labor's Exh. C-94, at 40.

Dr. Lipscomb also noted that Cedar Springs had added "milieu specialists" to respond to violent threats. She concluded that these additions had shown the feasibility of this abatement measure.

For reconfiguration of nurses' stations, the director of nursing testified, explaining that the psychiatric hospital had responded to the citation by redesigning nurses' stations and tinting the windows. *Id.* vol. 3, at 214–217; *id.* vol. 8, at 294. In addition, Dr. Forman and Dr. Lipscomb concluded that these barriers showed that the hospital could have taken similar measures before the inspection. *Id.* vol. 10, Secretary of Labor's Exh. C-92, at 23 (Dr. Forman opining on feasibility based on the eventual enclosures of nurses' stations in Cedar Springs' acute units); *id.* vol. 10, Secretary of Labor's Exh. C-94, at 24 (Dr. Lipscomb opining on feasibility based on "[t]he fact that these changes ha[d] been made to a number of high-risk units").

Cedar Springs also suggests a difficulty in adding silent communication devices. But this suggestion isn't clear; Cedar Springs says

36

only that it didn't respond to the citation by getting silent communication devices. Br. of Petitioner Cedar Springs Hospital, Inc. at 20; Reply Br. of Petitioner Cedar Springs Hospital, Inc. at 4. If Cedar Springs is intending to question the feasibility of getting silent devices, we would lack any reason to disturb the Review Commission's finding. In fact, Cedar Springs' parent company recommended consideration of panic buttons in areas that didn't have phones. R. vol. 10, Secretary of Labor's Exh. C-78, at 2.

Cedar Springs concedes that its parent company recommended "more fixed panic alarms." Reply Br. of Petitioner Cedar Springs, Inc. at 4. But Cedar Springs denies the feasibility of "*personal* silent alarms." *Id.* (emphasis added). The problem with this distinction is that the citation didn't call for personal alarms. The citation simply required

- "a means to silently communicate need for assistance without alerting the patient population" and

- "install[ation] [of] the alert signal in a way that is not visible to patients."

R. vol. 10, Secretary of Labor's Exh. C-1, at 6–7. The citation didn't specify whether the silent communication devices were to be fixed or distributed to staff. So Cedar Springs' challenge doesn't undermine the Secretary's reliance on the need to provide staff with some means of silent communication.

In any event, Dr. Lipscomb testified that "[i]ndividual panic alarms (which include GPS functions) are widely used throughout health,

37

including behavioral health and should be considered to enhance the ability of staff to summon[] support during behavioral emergencies while not alerting patients to the need for additional staff." *Id.* vol. 10, Secretary of Labor's Exh. C-94, at 26. This testimony about industry practice would support the feasibility of more silent devices even if the citation had required the devices to be mobile rather than fixed. *See* p. 35, above (discussing the evidence of feasibility based on practices elsewhere).

Cedar Springs also argues that the government failed to calculate the expense of these additional steps. But a measure can be considered *feasible* even without a specific price-tag. *See SeaWorld of Fla. v. Perez*, 748 F.3d 1202, 1215 (D.C. Cir. 2014) (concluding that feasibility was supported by evidence that an employer "ha[d] implemented many of the[] [proposed] measures on its own" without discussing the exact costs of these measures). In addition, expert witnesses supported the feasibility of these abatements by pointing to the measures that Cedar Springs had taken after the citation. R. vol. 10, Secretary of Labor's Exh. C-92, at 23; *id.* vol. 10, Secretary of Labor's Exh. C-94, at 40, 44. For example, an expert witness stated: "I can think of no greater proof that something is feasible [than] that it has already been done." *Id.* vol. 10, Secretary of Labor's Exh. C-92, at 23. With this evidence, the Secretary could prove feasibility without pinpointing the exact cost.

For these reasons, we conclude that the Review Commission didn't err legally or factually in finding that adoption of the abatement measures would have been feasible.

**7.    The Review Commission didn't err by upholding sanctions for failing to preserve video evidence.**

In upholding the penalty, the Review Commission pointed out that Cedar Springs had recorded over many of the subpoenaed videotapes. Given the inability to furnish these recordings, the Review Commission imposed sanctions consisting of inferences that the lost recordings would have supported Cedar Springs' knowledge of workplace violence, the gravity of the violence, and the need for greater measures to address employee safety.

Cedar Springs challenges these sanctions, arguing that

- it took reasonable efforts to preserve the video recordings,

- the inability to furnish the recordings wasn't prejudicial, and

- the imposition of adverse inferences was unwarranted.

For these challenges, we apply the abuse-of-discretion standard, accepting the Review Commission's factual findings unless they are clearly erroneous. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007). We conclude that the Review Commission didn't abuse its discretion.

39

Cedar Springs relies primarily on its Risk Management Director, who blamed a network outage and insisted that she had taken extraordinary efforts to preserve the videos, using two computers and collecting timelines from employees. But the Risk Management Director

- acknowledged that she couldn't recall if she had reviewed or saved video recordings of specific incidents involving workplace violence and

- failed to keep a list of video recordings that she had reviewed.

*See* R. vol. 6, at 92–100. Irrespective of the Risk Management Director's alleged efforts, Cedar Springs failed to furnish many of the video recordings reflected in internal logs. R. vol. 18, at 554–55.

An example of the discrepancy involves a violent episode after the government had subpoenaed the videos. A former nurse testified that footage would have existed. *Id.* vol. 5, at 91–101; *id.* vol. 10, Secretary of Labor's Exh. C-15. But Cedar Springs didn't furnish any footage of the episode or explain the omission.

Another example involves a violent incident in January 2020. A risk-management form stated that a video had captured the incident. *Id.* vol. 10, Secretary of Labor's Exh. C-14, at 3. But Cedar Springs didn't furnish the footage.

When asked about the discrepancies, the Risk Management Director admitted that she had stopped retaining the videos. But she couldn't remember why she had stopped. *Id.* vol. 9, at 69–70. The Review

Commission thus acted reasonably in concluding that Cedar Springs had not taken reasonable steps to preserve the recordings.

Cedar Springs also denies any prejudice, pointing out that the Secretary used few of the recordings that she had. The Review Commission could reasonably infer that the Secretary of Labor had used few of the videos because the more pertinent ones had been withheld. That inference would support a finding of prejudice.

Cedar Springs also

- argues that the video footage would not have addressed some issues involving the effectiveness and feasibility of the abatements and

- points to the lack of audio or zoom capability.

Granted, the footage lacked audio, couldn't be enlarged through zooming, and wouldn't resolve every factual dispute. But the footage could have shown staffing levels and response times. *Id.* vol. 18, at 400. And Cedar Springs itself offered some of the footage. *Id.* at 401. So the cited limitations to the footage wouldn't undermine the finding of prejudice.

Finally, Cedar Springs characterizes the adverse inferences as the equivalent of a default judgment. But the Review Commission didn't regard the adverse inferences as conclusive. To the contrary, the Review Commission pointed out that Cedar Springs would get a chance to rebut these inferences.

41

The Review Commission thus didn't err in imposing sanctions consisting of adverse inferences against Cedar Springs.

## 8.    Conclusion

The Review Commission could issue citations against Cedar Springs for violating the general duty clause even if other agencies and accrediting bodies had found satisfaction of other requirements. In addition, the government provided fair notice of the allegations.

In concluding that feasible measures existed to reduce the hazards of violence against employees, the Review Commission applied the correct standards and had substantial evidence for the factual findings.

Finally, the Review Commission didn't err in upholding sanctions for failing to preserve evidence.

So we deny Cedar Springs' petition for review.