# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 9, 2020                    Decided March 3, 2020

No. 19-1089

BHC NORTHWEST PSYCHIATRIC HOSPITAL, LLC, D/B/A
BROOKE GLEN BEHAVIORAL HOSPITAL,
PETITIONER

v.

SECRETARY OF LABOR,
RESPONDENT

---

On Petition for Review of an Order of the
Occupational Safety & Health Review Commission

---

*Carla J. Gunnin* argued the cause and filed the briefs for petitioner. *Tressi L. Cordaro* entered an appearance.

*Anne R. Godoy*, Attorney, U.S. Department of Labor, argued the cause for respondent. With her on the brief were *Edmund C. Baird*, Associate Solicitor, *Charles F. James*, Counsel, and *Jessica Cole*, Attorney.

Before: PILLARD and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: The Occupational Safety and Health Act's General Duty Clause, enforced by the U.S. Secretary of Labor, requires every employer to provide a workplace "free from recognized hazards that are causing or are likely to cause death or serious physical harm to [its] employees." 29 U.S.C. § 654(a)(1). In this case, the Secretary cited an inpatient psychiatric facility, Brooke Glen Behavioral Hospital, for violating the General Duty Clause by inadequately protecting its employees from the "recognized hazard[]" of patient aggression toward staff. Brooke Glen now petitions us for review of the administrative decision affirming the citation, *see BHC Nw. Psychiatric Hosp. LLC*, OSHRC Docket No. 17-0063, 2019 WL 989734 (Jan. 22, 2019) (ALJ), contending it is not supported by substantial evidence and that the agency failed to provide adequate notice of the workplace safety measures the General Duty Clause requires. To the extent they are preserved, Brooke Glen's objections fail to overcome our deference to the agency, so we dismiss in part and deny in part the petition for review.

## BACKGROUND

Brooke Glen, also known as BHC Northwest Psychiatric Hospital LLC, is a 146-bed facility in Pennsylvania that employs some 200 staff and treats patients who, due to serious psychiatric and behavioral issues, often pose a danger to themselves or others. *See id.* at *2. Brooke Glen is owned by Universal Health Services, Inc., and managed by UHS of Delaware, Inc. The Secretary cited both Brooke Glen and Arbour-HRI Hospital, a smaller inpatient psychiatric facility in Massachusetts owned and managed by the same corporate entities, for violating the General Duty Clause by inadequately protecting their staff from the risk of patient aggression. Both UHS facilities contested the citations in separate administrative proceedings before the same Administrative Law Judge (ALJ).

The ALJ upheld Brooke Glen's citation but vacated Arbour-HRI's.

In reviewing the citation of Brooke Glen for violating the General Duty Clause, the ALJ heard testimony from the Secretary's expert, Dr. Jane Lipscomb, and Brooke Glen's expert, Monica Cooke, who addressed the effectiveness of various measures for protecting employees from the recognized hazard of death or serious physical harm from patient aggression. *See id*. at *5. The ALJ qualified both Dr. Lipscomb and Ms. Cooke as experts, but placed less weight on Cooke's testimony because her examination of Brooke Glen's workplace violence was limited in time and scope and, in some respects, unsupported by evidence. *See id*. at *6-7. The ALJ took care to note that Brooke Glen was not cited for inadequately protecting against "the hazard of patient on staff violence" by "fail[ing] to follow clinical care guidelines" or by delivering "inappropriate clinical care." *Id*. at *11.

Examining Brooke Glen's workplace violence program, the ALJ concluded that the facility failed to update or implement various written safety policies. For example, Brooke Glen's staff training was inadequately implemented: The facility had a PowerPoint presentation covering workplace violence, but failed to present evidence of "how or if [the presentation] was made available to employees." *Id*. at *25. The ALJ found that the facility's Code 100 system—used to summon help in psychiatric emergencies—relied on phones inadequately distributed throughout the facility and walkie-talkies that staff lacked or that frequently did not work. *See id*. at *15-17. Brooke Glen's written policies required "a post-incident debriefing of the people involved" in any incident of patient aggression to better prepare staff to prevent such violence in the future. *Id*. at *12. The ALJ found, however, that staff "debriefings did not consistently occur" and that, even

when they did, "their scope was often so limited" that they did not meaningfully contribute to workplace safety. *Id*. at *12-13.

Brooke Glen adduced evidence showing that its average patient aggression rate in 2016 was 4.41 incidents over 1,000 patient days, significantly below both its 2014 average rate (11.85 incidents) and the total average rate across all UHS facilities in 2016 (8-10 incidents). The ALJ, however, noted several flaws in Brooke Glen's incident reporting process that impaired the information's reliability. First, the ALJ found that staff had no obligation to report "incidents of workplace violence that did not result in an injury requiring first aid," and that staff "could, but were not required to" report incidents in which a patient injured them. *Id*. at *19. A related reporting system that tracked incidents in which patients were restrained did not capture "the high number of occurrences of patient on staff violence that did not end in a restraint." *Id*. at *13. As for a third recordkeeping system, MIDAS, the ALJ concluded that not "all direct care employees" used it, and that information entered into MIDAS did not "effectively contribute[] to abating patient on staff violence." *Id*. at *14.

Having concluded that Brooke Glen inadequately implemented its existing workplace safety program, the ALJ considered the measures the Secretary recommended Brooke Glen implement to come into compliance with its obligation to protect its staff from patient-inflicted harms. The ALJ agreed that the Secretary's principal recommendation—having Brooke Glen complete a self-evaluation and institute a comprehensive workplace violence prevention and response program—would effectively address the gaps in the present system. *See id*. at *28-29. The ALJ also held that the Secretary's more targeted recommendations would materially reduce the risk of patient-on-staff aggression: ensuring more consistent reporting of incidents of patient-on-staff aggression

together with routine debriefing following those incidents to detect and respond to systemic issues, *see id.* at \*35-37; increasing staffing to manage the risk of patient aggression, *see id.* at \*30-33; improving procedures for summoning help during violent encounters, *see id.* at \*33-35; involving frontline staff on committees tasked with reviewing workplace safety policies, *see id.* at \*37-39; and enhancing training regarding patient-on-staff violence and related policies and procedures, *see id.* at \*39. In view of the inadequacies in Brooke Glen's implementation of its safety program and the clear prospect that the Secretary's recommended measures would materially reduce the hazard of patient-on-staff violence, the ALJ affirmed the cited General Duty Clause violation. *See id.* at \*43.

As mentioned above, the Secretary had also cited another UHS facility, Arbour-HRI, for violating the General Duty Clause by inadequately protecting against patient-on-staff aggression, but on the same day the ALJ upheld Brooke Glen's citation, she vacated Arbour-HRI's. *See HRI Hosp., Inc.*, OSHRC Docket No. 17-0303, 2019 WL 989735 (Jan. 22, 2019) (ALJ). Based on a hearing with testimony from the same experts who had testified about Brooke Glen, the ALJ concluded that Arbour-HRI had been effectively implementing its policies, including many of the Secretary's recommended safety measures, and that the balance of the recommended measures would not have meaningfully reduced the hazard of patient-on-staff violence. *See id.* at \*29-30. For example, the ALJ concluded that Arbour-HRI's workplace violence policies, unlike Brooke Glen's, were regularly reviewed and updated with input from frontline staff. *See id.* at \*17-19. Arbour-HRI's training program included the same PowerPoint presentation as Brooke Glen had on file, but, unlike in Brooke Glen's case, the ALJ described in detail how Arbour-HRI effectively used its training materials. *See id.* at \*9. The ALJ's

findings also reflect that Arbour-HRI's staff, unlike Brooke Glen's, reported and discussed every incident of patient-on-staff violence, regardless of severity, *see id*. at \*16, and had ready means to summon help during violent incidents, *see id*. at \*27.

In light of the divergent outcomes, Brooke Glen sought Occupational Safety and Health Review Commission (Commission or OSHRC) review of the ALJ's decision in its case, but the Commission exercised its discretion to deny review, rendering the ALJ's decision the final order of the Commission. *See* 29 C.F.R. §§ 2200.90(f), 2200.91(a). Brooke Glen timely petitioned this court under 29 U.S.C. § 660(a).

**ANALYSIS**

In reviewing an administrative decision affirming a citation issued under the Occupational Safety and Health Act, we accept the ALJ's "findings of fact as 'conclusive' if they are 'supported by substantial evidence on the record considered as a whole.'" *Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120 (D.C. Cir. 2014) (quoting 29 U.S.C. § 660(a)). The "application of the law to those facts will be overturned only if it is arbitrary, capricious, an abuse of discretion, or contrary to law." *Id*. at 120-21. Brooke Glen asserts in its petition for review that (1) the ALJ's affirmance of the General Duty Clause violation is not supported by substantial evidence, and (2) it lacked adequate notice of the additional workplace safety measures the hospital needed to implement to avoid liability. Brooke Glen does not challenge the citation's penalty of $12,471.00, having stipulated that the amount would be appropriate under 29 U.S.C. § 666(j) if the General Duty Clause violation were affirmed. *See BHC Nw.*, 2019 WL 989734, at \*43.

## I. Substantial Evidence Supports the ALJ's Decision

"Substantial-evidence review is highly deferential to the agency fact-finder, requiring only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). Applying that deferential standard, "the question we must answer is not whether record evidence supports petitioner's version of events, but whether it supports" the ALJ's conclusion that Brooke Glen violated the General Duty Clause. *AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 73 (D.C. Cir. 2004) (alterations and internal quotation marks omitted). Brooke Glen cites evidence that generally supports its "version of events" but, critically, does not undermine the ALJ's conclusion.

Proving "a violation of the General Duty Clause" requires the Secretary to

> establish that: (1) an activity or condition in the employer's workplace presented a hazard to an employee, (2) either the employer or the industry recognized the condition or activity as a hazard, (3) the hazard was likely to or actually caused death or serious physical harm, and (4) a feasible means to eliminate or materially reduce the hazard existed.

*SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1207 (D.C. Cir. 2014) (quoting *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007)). Brooke Glen stipulated that the Secretary established the first two elements, *see BHC Nw.*, 2019 WL 989734, at \*3, and does not here contest the third, focusing its petition solely on the fourth element—the feasible means it should have taken to materially reduce the hazard.

To prevail on that final element, the Secretary must "specify the particular steps a cited employer should have taken to avoid citation" and "demonstrate the feasibility and likely utility of those measures." *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1268 (D.C. Cir. 1973). Where, as here, "an employer has existing safety procedures, the burden is on the Secretary to show that those procedures are inadequate," *SeaWorld*, 748 F.3d at 1215, as measured against the precautions "a reasonably prudent employer familiar with the circumstances of the industry" would take, *id.* at 1207 (quoting *Fabi Constr.*, 508 F.3d at 1081). Rather than dispute the "feasibility" of the comprehensive workplace violence program and accompanying safety measures the Secretary specified, Brooke Glen contests those measures' "likely utility," *Nat'l Realty*, 489 F.2d at 1268, challenging the ALJ's conclusion that the recommended measures would materially reduce the hazard of patient violence beyond what Brooke Glen's existing safety program already achieved. *See* Pet'r Br. 28-39. Brooke Glen contends that the ALJ should have placed greater weight on Ms. Cooke's expert testimony, *see id.* at 38-39, and that the Secretary's recommended safety measures would not materially reduce Brooke Glen's already low incidence of patient aggression, *see id.* at 28-37.

In particular, Brooke Glen asserts that the ALJ should have credited its industry expert, Ms. Cooke, over the Secretary's expert, Dr. Lipscomb, whom Brooke Glen discounted as "an academic with no real experience in the industry." *Id.* at 38. Yet we must "accept the ALJ's credibility determinations unless they are patently unsupportable," *SeaWorld*, 748 F.3d at 1208 (alteration omitted) (quoting *AJP Constr.*, 357 F.3d at 73), including by deferring to "the ALJ's reasonable determination regarding not only the relevance but the reliability of expert testimony," *id.* at 1214 (alteration omitted) (quoting *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151

F.3d 1096, 1107 (D.C. Cir. 1998)). Under that deferential standard, Brooke Glen's challenge fails. The ALJ permissibly declined to place significant weight on Cooke's testimony because, in addition to various temporal, substantive, and informational limitations on her examination of Brooke Glen's safety policies, *see BHC Nw.*, 2019 WL 989734, at \*6, her "expert opinion focused on whether what [Brooke Glen] was doing was consistent with the industry," *id*. at \*7. We have held that "a safety precaution" that "is recognized by safety experts" need not "find general usage in an industry" or have "become customary" for "its absence [to] give[] rise to a" violation of the General Duty Clause. *Nat'l Realty*, 489 F.2d at 1266 n.37. Brooke Glen also identifies nothing to contradict the ALJ's conclusion that "information Ms. Cooke cites . . . [is] not adequately borne out by the evidence." *BHC Nw.*, 2019 WL 989734, at \*6. And, while Brooke Glen asserts that Dr. Lipscomb relied on an academic study to find fault with Brooke Glen that it contends was not also brought to bear in the Arbour-HRI proceeding, the ALJ did consider the study in both proceedings. *Compare id*. at \*29 & n.69, *with HRI Hosp.*, 2019 WL 989735, at \*8.

Next, Brooke Glen argues that the Secretary "provided no evidence of how" the recommended safety measures would further reduce the already low rate of patient aggression at Brooke Glen. Pet'r Br. 32. But, for starters, the flaws the ALJ identified in Brooke Glen's reporting process diminish the significance of its recorded rate of patient aggression. Even accepting the rate on its own terms, a low rate of workplace accidents cannot alone establish compliance with the General Duty Clause. Just as "actual occurrence of hazardous conduct is not, by itself, sufficient evidence of a violation" of the General Duty Clause, "hazardous conduct need not actually have occurred," or have occurred at any particular rate, for an employer to be liable. *Nat'l Realty*, 489 F.2d at 1267. The

General Duty Clause inquires not how an employer's accident rate compares with its own history or industry averages, but whether "a reasonably prudent employer familiar with the circumstances of the industry would have protected against the hazard in the manner specified by the Secretary's citation." *SeaWorld*, 748 F.3d at 1207 (quoting *Fabi Constr.*, 508 F.3d at 1081). The relatively low "overall patient aggression rate" at Brooke Glen, Pet'r Br. 30, while salutary, does not answer the key question whether the Secretary's measures would appropriately safeguard employees by "materially reduc[ing] the hazard" of patient-on-staff violence, *SeaWorld*, 748 F.3d at 1215.

According to the ALJ, Brooke Glen's principal shortcoming was not its rate of patient-on-staff violence, but its failure to fully "implement the policies it had on paper" to prevent such violence. *BHC Nw.*, 2019 WL 989734, at *42. Another reviewing court has similarly held that the fact that an employer "incorporated the relevant" safety measures "into its own safety manual does not satisfy its obligation" under the General Duty Clause unless those measures are actually "followed and enforced." *Nelson Tree Servs., Inc. v. OSHRC*, 60 F.3d 1207, 1211 (6th Cir. 1995). We likewise held in *SeaWorld* that an employer's decision to implement safety measures only for workers interacting with one killer whale supported General Duty Clause liability because the employer failed to institute those measures throughout its facility. *See* 748 F.3d at 1215. Despite Brooke Glen's effort to undercut the ALJ's findings of inadequate implementation by highlighting contrary yet highly general testimony from its own risk manager, *see* Pet'r Br. 31-32 (quoting J.A. 485-486), the ALJ's refusal to credit that testimony is not "patently unsupportable" based "on the record considered as a whole," *AJP Constr.*, 357 F.3d at 73 (quoting 29 U.S.C. § 660(a)).

In view of the multiple shortcomings in Brooke Glen's overall process of preventing and, when it nonetheless occurs, tracking and addressing patient-on-staff violence, the Secretary specified a thorough self-evaluation for Brooke Glen "to determine what action or combination of actions will," in the form of a comprehensive workplace violence prevention program, "eliminate or materially reduce the hazard." *BHC Nw.*, 2019 WL 989734, at \*29 (quoting *Pepperidge Farm, Inc.*, 17 BNA OSHC 1993 (No. 89-265, 1997)). Contrary to Brooke Glen's assertions, *see* Pet'r Br. 32-34, the Secretary need not quantify the extent to which that program and its component parts "would have materially reduced the likelihood" of patient-on-staff violence, *Nat'l Realty*, 489 F.2d at 1267. Instead, the Secretary satisfied the General Duty Clause's test by establishing that a comprehensive workplace safety program would more effectively and consistently apply measures designed to reduce patient-on-staff violence than Brooke Glen's present system did.

In sum, substantial evidence supports the ALJ's conclusion that Brooke Glen's incomplete and inconsistently implemented safety protocols "were inadequate to . . . materially reduce the hazard" posed by patient-on-staff violence. *SeaWorld*, 748 F.3d at 1215. The ALJ's determination that a more comprehensively considered and applied program would materially reduce the hazard was fully warranted by her legal analysis and evidentiary findings.

## II. The General Duty Clause Provided Fair Notice Here

Brooke Glen contends that it lacked fair notice that the General Duty Clause might be applied as it was here—especially when contrasted with the ALJ's decision to vacate the citation in the Arbour-HRI case. "A fundamental principle in our legal system," assured here by the Fifth Amendment's

Due Process Clause, "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). We have "accommodated possible constitutional problems with fair notice in this context by interpreting 'recognized hazard' only to include preventable hazards," *SeaWorld*, 748 F.3d at 1216, and by applying the General Duty Clause "only when a reasonably prudent employer in the industry would have known that the proposed method of abatement was required," *id*. (quoting *Donovan v. Royal Logging Co.*, 645 F.2d 822, 831 (9th Cir. 1981)).

Contending that the Secretary provided "a fundamental lack of fair notice . . . regarding what abatement methods would materially reduce the hazard of patient aggression to staff and what specific measures must be enacted" to avoid future citation, Reply Br. 1, Brooke Glen assails the application of the reasonably-prudent-employer and material-reduction standards in this case as unconstitutionally vague. But neither a context-sensitive reasonableness standard nor an unquantified precautionary threshold is necessarily vague. *Cf. Crooks v. Mabus*, 845 F.3d 412, 418 (D.C. Cir. 2016). And even if the scope of a general standard "may not be clear in every application," where its "terms are clear in their application to" the conduct at issue, the "vagueness challenge must fail." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010).

The Secretary identified specific measures, including an overarching workplace violence prevention program, needed to meet the requirements of the General Duty Clause and protect staff from patient violence at a sizable inpatient psychiatric hospital like Brooke Glen. The ALJ found that those measures accord with well-known industry best practices and peer-reviewed research. *See BHC Nw.*, 2019 WL 989734, at *29. The need for full and consistent implementation of such

measures is or should be evident to reasonably prudent managers of any major psychiatric inpatient hospital—indeed, as in *SeaWorld*, the General Duty Clause's application here turned in significant part on the employer's failure to extend throughout its workplace the very safety "measures it had [already] applied," albeit inconsistently. 748 F.3d at 1216. The ALJ was particularly troubled by the internal disconnect between Brooke Glen's written policies and its actual practice, noting that, had "the record showed that [Brooke Glen] had the program it described to Ms. Cooke, it would have been more difficult for the Secretary to meet his burden." *BHC Nw.*, 2019 WL 989734, at *26 n.62. Brooke Glen can hardly object that it was blindsided by the utility of measures it had already embraced, at least on paper.

The contrast between the ALJ decisions in Arbour-HRI's case and this one underscores the point. Brooke Glen contends that the "diametrically opposite results" in the parallel cases support its fair-notice claim because an "employer reading the two decisions to determine its compliance obligations in this area would be completely mystified." Pet'r Br. at 45. But the pair of cases throws into clear relief the nature of Brooke Glen's shortfall. Brooke Glen, unlike Arbour-HRI, allowed whole categories of incidents to go unreported and failed to review and learn from incidents that had occurred. *Compare HRI Hosp.*, 2019 WL 989735, at *16, *with BHC Nw.*, 2019 WL 989734, at *12-13, *19. And, unlike Arbour-HRI, Brooke Glen failed to ensure that staff would have means at hand throughout the facility to summon help. *Compare HRI Hosp.*, 2019 WL 989735, at *27, *with BHC Nw.*, 2019 WL 989734, at *15-17. Likewise, only Brooke Glen failed to involve its employees in formulating policies to combat patient-on-staff violence and was unable to show the effectiveness of its training. *Compare HRI Hosp.*, 2019 WL 989735, at *20, *with BHC Nw.*, 2019 WL 989734, at *23-25. The non-arbitrariness

of the ALJ's decision to affirm Brooke Glen's citation even as it vacated Arbour-HRI's is established by Brooke Glen's different factual record—involving similar policies, but markedly different implementation of them in practice.

In addition to its as-applied constitutional challenge, Brooke Glen objects "that rulemaking—rather than the blunt General Duty Clause—is the only appropriate tool" for the Secretary "to establish and enforce compliance obligations" regarding the "nebulous, complicated, and individualized nature of workplace violence" as it "exists in the behavioral hospital setting." Pet'r Br. 46-47. We may not consider this objection because, absent "extraordinary circumstances," "[n]o objection that has not been urged before the Commission shall be considered by the court." 29 U.S.C. § 660(a); *see also Frank Lill & Son, Inc. v. Sec'y of Labor*, 362 F.3d 840, 844 (D.C. Cir. 2004). Brooke Glen did not raise rulemaking in its petition for discretionary review and has identified no "extraordinary circumstances" to excuse that failure. *Frank Lill*, 362 F.3d at 844 (quoting 29 U.S.C. § 660(a)). By not responding to the Secretary's observation that the rulemaking argument was unpreserved, *see* Resp't Br. 47-48, Brooke Glen further forfeited the point, *cf. Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017). We therefore cannot consider Brooke Glen's objection that the Secretary may only police patient-on-staff violence via notice-and-comment rulemaking, as opposed to agency adjudication under the General Duty Clause.

\*   \*   \*

We dismiss the petition for review of the ALJ's decision affirming the General Duty Clause citation insofar as the petition challenges the agency's authority to guard against patient-on-staff violence via adjudication rather than

15

rulemaking.  In all other respects, including as to substantial evidence and adequate notice, the petition is denied.

*So ordered*.